

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:SKW/GMR
F. #2023R00922

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 17, 2024

**TO BE FILED UNDER SEAL**

By E-Mail and ECF

The Honorable Lois Bloom
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Asif Merchant
                Magistrate Docket No. 24-467

Dear Judge Bloom:

      The defendant Asif Merchant, also known as "Asif Raza Merchant," is scheduled to be presented before Your Honor tomorrow on the above-referenced complaint filed in the Eastern District of New York which charges him with interstate murder-for hire, in violation of Title 18, United States Code, Section 1958. For the reasons set forth below, the government respectfully submits that the Court should enter a permanent order of detention because the defendant presents a severe and ongoing danger to the community—especially to U.S. political officials—and a serious risk of flight.

I.      The Offense Conduct[1]

      Beginning no later than the spring of 2024, Merchant orchestrated a plot to assassinate U.S. government officials and steal information on U.S. soil. After spending time in Iran, Merchant flew from Pakistan to the U.S. to recruit hitmen to carry out his scheme.

      More specifically, in approximately April 2024, Merchant arrived in the U.S. and contacted a person he believed could assist him with the criminal scheme, but who in fact reported Merchant's conduct to law enforcement and became a confidential source (the "CS"). At first, Merchant told the CS that he wanted to discuss potential business opportunities,

---

[1] The relevant facts, as they pertain to the defendant's pretrial detention, are proffered herein. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (holding that the government is entitled to proceed by proffer in detention hearings).

including selling "yarn-dyed" clothing from Pakistan to the U.S. Merchant, however, later revealed to the CS that the yarn-dyed clothing business was just a guise for his assassination plot.

On or about June 3, 2024, Merchant traveled from Texas to New York to meet with the CS. Explaining his assassination plot, Merchant stated that plot involved three different components: (1) stealing documents or USB drives from a target's home; (2) planning a protest; and (3) killing a politician or government official. Merchant stated that the victims would be "targeted here," meaning in the U.S. He also stated that the "people who will be targeted are the ones who are hurting Pakistan and the world, [the] Muslim world. These are not just normal people." While describing the assassination plot, Merchant made a "finger gun" motion with his hand, indicating he meant murder. Merchant stated that the people he worked for overseas told him to "finalize" the plan, so he asked the CS to set up meetings with hitmen who could carry out the plot. Merchant stated that he performed "Istikharah from Quran before doing this," meaning Merchant prayed to God "about whether [he] should do this work or not" and received clarity from God to carry out his mission.

On or about June 10, 2024, Merchant met with the purported hitmen, who were in fact undercover U.S. law enforcement officers (the "UCs") whom the CS introduced to Merchant at Merchant's request. Merchant advised the UCs that he was looking for three services from them, including killing a "political person." During the meeting, Merchant presented himself as the "representative" in the U.S., indicating that there were other people he worked for outside the U.S. Merchant told the UCs that he wanted to pay the hitmen in cash through "hawalas"—an informal and unregulated method of transferring money—in Istanbul and Dubai. Merchant also stated that he would give the hitmen instructions on who to kill either the last week of August 2024 or the first week of September 2024, after he returned to Pakistan. Merchant requested that the UCs provide him with a secure cellular phone so they could communicate, and the UCs said they would do so. The UCs also told Merchant that they would be in touch about how much their services would cost.

On or about June 12, 2024, Merchant met the UCs again and obtained the cellular phone from the UCs to use in furtherance of the assassination plot. During the meeting, Merchant agreed to pay the UCs a $5,000 advance payment for the plot.

Following the meeting with the UCs, Merchant met with the CS again in furtherance of the plot. On or about June 13, 2024, Merchant wrote out coded language on a piece of paper that he instructed the CS to copy down and use when communicating with him in the future. Merchant wrote that the word "tee-shirt" would mean a "protest," which he described as the "lightest work." The phrase "flannel shirt" would mean "stealing," which was "heavier work." The phrase "fleece jacket," the heaviest work, would mean "the third task . . . commit the act of the game," indicating murder as previously discussed. The phrase "denim jacket" referred to "sending money." Merchant told the CS to use the code words only orally on the phone and not to text them.

Merchant then began arranging the means to obtain the $5,000 cash to pay the UCs, which he eventually received with assistance from an overseas relative. On or about June 20, 2024, Merchant arranged for the CS to pick up the $5,000 in Queens, New York. The next day, Merchant met with the UCs in Manhattan and paid them the $5,000 advance for the murder plot. After Merchant handed over the money, one of the UCs stated "now we're bonded," to which Merchant responded "yes." The UC then stated "Now we know we're going forward. We're doing this," to which Merchant responded "Yes, absolutely."

Merchant reiterated that the plan was for the UCs to go forward with his three plots previously discussed—the assassination, the protest, and the stealing of documents. Merchant added that he wanted the UCs to launder money for him as well. Merchant explained that he would leave the U.S. before giving the UCs additional details about the plot and suggested meeting the UCs in Dubai or Istanbul to convey the instructions because it would be "easier" for him. Merchant reiterated that the plot would occur in the U.S. Merchant ended the meeting by telling the UCs that he would be in touch to deliver further instructions.

Merchant made flight arrangements and planned to travel out of the U.S. on Friday, July 12, 2024. Merchant was arrested prior to his departure from the U.S. Notably, when the FBI arrived at his residence to execute the arrest as well as a search warrant for the residence, Merchant refused to exit his residence for approximately 20 minutes after the FBI announced their presence and the search warrant. During the search, law enforcement agents searched Merchant's wallet and found the handwritten note inside with the code words that Merchant invented to communicate with the CS about the assassination plot.

On July 15, 2024, Merchant was presented before a magistrate judge in the Southern District of Texas where he waived preliminary hearing and consented to removal to the Eastern District of New York.

II.    Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Section 3141 et seq., federal courts are required to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) (a judicial officer "shall" order detention if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by

the defendant's release. See 18 U.S.C. § 3142(g). As discussed below, these factors weigh heavily against pretrial release.

Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also LaFontaine, 210 F.3d at 130-31. In the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffer. Id. at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." Id. (internal quotation marks omitted); see also Mercedes, 254 F.3d at 437 (We find the district court committed clear error in failing to credit the government's proffer with respect to [the defendant's] dangerousness.").

III. The Court Should Enter an Order of Detention

All the factors to be considered in the detention analysis show that the defendant presents both a severe and ongoing danger to the community and U.S. government officials, as well as an overwhelming risk of flight if released on bond. Because there are no conditions that will reasonably assure the defendant's appearance or the safety of the community, the Court should enter a permanent order of detention.

1. The Nature and Circumstances of the Offense Charged

The defendant's criminal conduct was extraordinarily serious. The defendant traveled to the U.S. and, over the course of several months, hired and paid individuals whom he believed to be hitmen to, among other things, kill U.S. politicians. The defendant's criminal conduct was a direct attack on the U.S. political system that threatened U.S. government officials' lives and our nation's stability and security. It was only because of the work of law enforcement that the defendant's plot was foiled before anyone got hurt or there was significant damage to national security interests.

2. The Weight of the Evidence

The weight of the evidence in this case is strong. Among other things, the evidence includes video and audio recordings of the defendant in which the defendant hires hitmen to murder U.S. government officials. The evidence also includes the $5,000 that Merchant paid the UCs as an advance for their services as purported hitmen, as well as audio and video recording of Merchant paying the money to the hitmen. In addition, conversations between Merchant and the CS about the code words for the murder, document theft, protest and sending money are corroborated by the code sheet with those codes, which was recovered from Merchant's wallet following his arrest.

3. The Defendant's History and Characteristics

The defendant's history and characteristics further demonstrate that he is a danger to the community and a risk of flight. The defendant is a citizen of a foreign country

4

who traveled to New York to orchestrate a murder, as he admitted to the CS. The defendant also expressed that he was planning the murder on behalf of others overseas because the individuals to be targeted for assassination were hurting Pakistan and the Muslim world. Such radicalized ideology demonstrates the defendant's dangerousness.

    4. <u>The Danger to the Community and Risk of Flight</u>

  The defendant poses a severe and ongoing risk to the community, especially to U.S. elected officials, which necessitates detention. There is simply no greater risk than someone who plans a murder and takes concrete steps to execute it, including hiring and paying hitmen. Working as the "U.S. representative" for people overseas, the defendant organized and planned a murder plot over the course of several months. Anything short of detention would enable the dangerous plot to continue and puts the country in grave danger.

  The defendant also poses a clear risk of flight. The defendant is a citizen of Pakistan and has a wife in children in Pakistan and a wife and children in Iran. The defendant has no long-term ties to New York City. Prior to flying from Pakistan to the United States, the defendant had spent two approximately two weeks in Iran. Given the seriousness of the murder for hire charges, the defendant has every incentive to flee to either Pakistan or Iran, significantly reducing the likelihood of his appearance in this case should he flee. The defendant also took steps to avoid detection by law enforcement, including creating a secret code to discuss the plot, indicating his intent to evade law enforcement.

  In addition, the defendant faces up to ten years' imprisonment. <u>See</u> 18 U.S.C. § 1958. Since the prospect of a lengthy term of incarceration may reasonably incentivize the defendant to flee, the defendant's potential sentence demonstrates that he is a serious risk of flight. <u>United States v. Dodge</u>, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (finding possibility of a "severe sentence" heightens the risk of flight).

IV. <u>Sealing</u>

  The government respectfully requests permission to file this submission under seal. The government is sensitive to the need to minimize the amount of information in a criminal case that is filed under seal. <u>See, e.g.</u>, <u>United States v. Aref</u>, 533 F.3d 72, 83 (2d Cir. 2008) (noting "the requirement that district courts avoid sealing judicial documents in their entirety unless necessary"); <u>Lugosch v. Pyramid Co.</u>, 435 F.3d 110, 119- 20 (2d Cir. 2006) (noting that sealing orders should be "narrowly tailored"). However, for the reasons described herein, sealing is necessary to preserve important government interests. As these facts provide ample support for the "specific, on the record findings" necessary to support sealing, <u>Lugosch</u>, 435 F.3d at 120, the government respectfully requests that the Court record those findings and file this submission under seal.

5

V.    <u>Conclusion</u>

For the reasons set forth above, the government respectfully submits that the Court should enter a permanent order of detention.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   <u>/s/ Sara K. Winik</u>
Sara K. Winik
Gilbert Rein
Assistant U.S. Attorneys
(718) 254-7000

cc:   Clerk of Court (by ECF and email)
Counsel for the defendant (by ECF and email)