MOSKOWITZ COLSON
GINSBERG SCHULMAN

Moskowitz Colson
Ginsberg & Schulman LLP
1 Battery Park Plaza
31st Floor
New York, NY 10004
(212) 257-6455
www.mcgsllp.com

October 27, 2026

By ECF

Hon. Eric Komitee
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Asif Merchant
24 Cr. 362 (EK)

Dear Judge Komitee:

Although the charges for which Asif Merchant was found guilty are serious, this is an unusual case where the plot underlying those charges was so poorly conceived and executed, it neither could nor was intended to succeed. Indeed, the government's own evidence sounds more like the plot of an Inspector Clouseau movie than James Bond.

Mr. Merchant is not a trained intelligence operative. There is no evidence that Mr. Merchant had any military experience, any history of political violence, or any history of violent or criminal behavior at all. He was and is an educated businessman, a devoted family man and a devout Shiite Muslim. After a lengthy career as a banker, Mr. Merchant decided to pursue a business of his own. Unfortunately, his business endeavors led to a series of events that put Mr. Merchant in the clutches of the Iranian Islamic Revolutionary Guard Corps ("IRGC"), and ultimately, brought him to the point where he is now facing decades in an American prison.

As described in detail below and testified to during the trial presided over by Your Honor, Mr. Merchant's business activities brought him into contact with a man calling himself Meherdad, a representative of the Iranian government for whom Mr. Merchant was going to conduct hawala transactions to help Iran evade American imposed economic sanctions. Meherdad, who eventually revealed that he worked for Sepah (which Mr. Merchant understood to be an intelligence agency in Iran), subsequently recruited Mr. Merchant to attempt to implement a serious and challenging plan to hire hitmen to assassinate American politicians running for national office and engage in various other criminal activities. As he testified at trial, Mr. Merchant believed that he could not refuse Meherdad's request without endangering the lives of his wife and adopted daughter in Iran. Meherdad sent Mr. Merchant here after ten to

twenty hours of training (Tr. 1117), with little money and nobody to contact for logistical support. Indeed, the evidence at trial established that Mr. Merchant had to borrow money from his family to further the Sepah scheme. While in the United States, Mr. Merchant sought the assistance not of a pro-Iranian radical or operative, but of United States Army veteran, who while Muslim, helped translate for American troops in Afghanistan and by his own admission, supported President Trump in the 2024 election. And through a misunderstanding in the use of the word "mafia" in Urdu, Mr. Merchant purportedly made an agreement for future "work" with men posing as members of the American Cosa Nostra, the least likely type of criminal to aid the Republic of Iran or any other Muslim country in a plot against American leaders.

The defense does not in any way seek to minimize the severity of the underlying plot nor make light of it, but these are the facts borne out by the evidence and they indicate that while this plot was real on a certain level, it was not and could not have been intended or expected to reach any sort of fruition. Moreover, once caught, Mr. Merchant proffered to the government over many hours and was willing to cooperate in the hopes that both he and his family could escape the dangers they faced in Iran. Instead of using the information provided by Mr. Merchant to attempt to investigate, capture, and prosecute the professional agents who devised the scheme to assassinate American officials, the government leaked details of the proffers, thereby endangering the lives of Mr. Merchant's wife and adopted daughter in Iran, who have not been heard from since the press reported on the proffers.

Under the circumstances, notwithstanding the seriousness of Mr. Merchant's conduct, it is respectfully submitted that a sentence substantially below the 30-year cumulative sentence recommended by the Probation Department would be sufficient, but not greater than necessary, to serve the statutory purposes of sentencing.

## A. <u>The History and Characteristics of the Defendant</u>

Mr. Merchant, who is now 48 years old, was born in Hyderabad, Pakistan. He grew up in Hyderabad and Karachi, where he now makes his primary home. He is the second of his parents' four children and their only son. His nuclear family was just one part of the sprawling network of family members with whom he grew up and to whom he remains close; before his arrest, he was in near-constant contact with not just his parents, his sisters, and his sisters' spouses and children, but with a large number of aunts, uncles, and cousins in Pakistan and across the globe.

Mr. Merchant has two wives, as is permitted by his religion and in the countries where they reside. He married his first wife Naheed, in Pakistan 22years ago. They have four children, the oldest of whom is a twenty-one-year-old college student and the youngest of whom is five years old.

Mr. Merchant excelled as a student, finishing his schooling in 2010 with an MBA. Subsequently, he had a successful career in banking. He began working as a junior officer at Metropolitan Bank in Karachi while he was still a student and was quickly promoted. After a few years, he left to take a job as a customer service supervisor at Faysal Bank, a position he held for about four years. He next took a job as operations manager at Silkbank. After about fifteen months at Silkbank, he worked in management at NIB Bank for about fourteen months. Next, he accepted a position as a Branch Manager at Bank of Punjab, a position he held for nine years.

Mr. Merchant's banking career was sufficiently lucrative that he was able to provide for his wife and children in Pakistan and still have enough money to take on other obligations. His religion encourages those with resources to care for those without, so Mr. Merchant decided to take and support another wife. During a pilgrimage to a holy site in Iraq in 2019, he met Huria Bulandi, a war widow raising a young daughter alone in Tehran, Iran. After discussing the matter with Naheed at great length and obtaining her blessing, Mr. Merchant married Huria and adopted her daughter the next year. For the next four years, Mr. Merchant split his time between his home in Karachi and the home he shared with Huria and her daughter in Tehran while he endeavored to get permission from the governments of Pakistan and Iran to bring Huria and her daughter to Karachi.

In around 2019, Mr. Merchant decided to leave the banking industry and go into business for himself. To establish the credentials and knowledge base he would need to succeed, he began training in the garment business at a company owned by his Uncle Kokab, who owned a garment factory and was willing to teach Mr. Merchant the business. In 2019, he left the bank to take a job at Kokab's company, continuing his business education while deciding exactly what kind of business he wished to create. Ultimately, Mr. Merchant's decided to establish his own import-export business. To learn the nitty gritty of import-export, he experimented with buying and reselling cars, earning a small profit. Next, he tried to export bananas to Iran, but the logistics of dealing with perishables were too complex for his level of experience. The bananas spoiled and he took a loss. Building on his experience with Kokab's company, he exported garments to Iran while brokering a sale of fiberglass insulation from Iran to Pakistan, though he faced complications exchanging currency with Iran as a result of sanctions imposed by the United States. That endeavor was successful, but the profit margins were poor. He therefore decided to continue in the garment export business, but decided to sell the goods he purchased from Kokab and other Pakistani manufacturers in the United States, where he could obtain higher prices. He started traveling regularly to Texas, where his sister, an uncle, and several other family members who could introduce him to potential buyers lived. During those trips to the United States, he also often traveled to New York to visit his friend, Nadeem Ali and pursue business opportunities.

B. <u>Mr. Merchant's Offense Conduct</u>

Having presided over the trial, the Court is fully familiar with the facts of this case, and they will therefore not be recited in full herein. However, Mr. Merchant's early encounters with Meherdad and the events that occurred before Mr. Merchant's fateful 2024 trip to the United States are worthy of discussion, because those early events explain why Mr. Merchant agreed to participate in the plot underlying his convictions.

After Mr. Merchant began travelling regularly to the United States to build his fledgling garment business and visit friends and family, his cousin Hosnain asked him whether he would be interested in doing hawala transactions for the Iranian Government, whose banking industry was crippled by American imposed sanctions. (Tr. 1108.) Hawala is an ancient form of banking commonly used in the Islamic world to send money from a person in one location to a recipient in another place. The sender goes to a hawala agent, deposits money for the recipient and the hawala agent located where the recipient is pays out the money upon proof that the person is in fact the intended recipient. Because Iran was subject to sanctions by the United States, it was not able to use the international banking system (SWIFT), and both the government of Iran and its

people had to resort to other methods to transmit money outside the country. (Tr. 1109.) Because money was tight while he worked to get his business off the ground, Mr. Merchant agreed that he might be interested in earning money through hawala transactions on behalf of Iran.

It is important to note that someone of Mr. Merchant's background and religion has a different view of Iran than many in the West. Mr. Merchant is a Shiite Muslim, and many of the holy sites to which he makes pilgrimages are in Iran. Moreover, the Supreme Leader of Iran is also considered the head of his religion. Mr. Merchant travelled to Iran numerous times on pilgrimages, and as noted above, he married a Shiite woman living in Tehran to whom he was spiritually connected. Thus, like many around the world, Mr. Merchant had a much more complicated and positive relationship with Iran, its government, and its people.

Hosnain set up a meeting for Mr. Merchant in Qom with a person named Ali Zaidi with the goal of discussing hawala work. At the initial meeting, they engaged in friendly conversation to get to know one another, discussing their respective import-export businesses and exchanging samples. (Tr. 1110.) They discussed the hawala business at a second meeting, after which Zaidi introduced Mr. Merchant to Meherdad Yousef. (Tr. 1111.) Mr. Merchant understood Meherdad to be a representative of the Iranian government who would be his contact for hawala transactions. After the three of them met once or twice to discuss hawala, Zaidi told Mr. Merchant that Meherdad worked for an agency called Sepah, which Mr. Merchant understood to be an intelligence agency. (Tr. 1112-1113.) The early meetings involved general conversation about Mr. Merchant's professional history and business endeavors. Mr. Merchant explained his efforts to do business in the garment industry in the United States, and Meherdad encouraged him to do so. (Tr. 1115.) After a number of meetings, Meherdad asked Mr. Merchant if he was interested in intelligence work as well as hawala work. Mr. Merchant, drawn to the excitement of intelligence work and hoping to make some money, was interested. Over the next several months, Meherdad gave him about ten to twenty hours of training in countersurveillance techniques including how to count security cameras at an airport. (Tr. 1116-1117.) Initially, Meherdad did not tell Mr. Merchant specifically what he was being trained for. He did not learn of the plan to hire hitmen in the United States until shortly before his trip in April 2024. (Tr. 1125-1126.)

Mr. Merchant's agreement to engage in intelligence work for Iran must be placed in its proper context. First, at the time, Mr. Merchant, who was trying to get his garment business off the ground, had no steady income and needed the extra income that such a job would provide. Second, when initially recruited, what he thought "intelligence work" would include was far more limited in scope. Mr. Merchant had no steady business and his contacts abroad were limited to family and some acquaintances. At that point, the idea that he would be asked to engage in a plot to assassinate high-ranking American officials or politicians would have sounded laughable. Indeed, as the evidence showed, Mr. Merchant had no real capability to bring about the plot Meherdad later ordered him to carry out.

More importantly, Mr. Merchant knew he was dealing with very dangerous people in the IRGC, and he needed to remain in their good graces for several reasons. Mr. Merchant has a wife and adopted daughter in Iran, and he could not do anything that would jeopardize their safety. Moreover, he could not get his wife out of Tehran and move her to Pakistan without the permission and assistance of the Iranian government, which he believed would not be forthcoming if he refused to engage in the tasks assigned by Meherdad. That point was driven home when an Iranian government official in Pakistan threatened to withhold his visa to visit his

wife if he did not agree to help obtain information for that official. The Iranian government also continued to withhold the marriage certificate which Mr. Merchant needed for Huria and their daughter to move from Iran to Pakistan.

In his initial interactions with Meherdad, in the spirit of getting to know one another, Mr. Merchant told Meherdad about his Iranian wife and child and about his desire to bring them to Pakistan as soon as his adopted daughter, then around 13 years of age, completed her education. To manipulate Mr. Merchant into doing his will, Meherdad exploited that information in two ways. First, the carrot: on several occasions, when Mr. Merchant expressed frustration about the complexity of the process of obtaining the necessary documentation from the Iranian government, Meherdad implied or outright stated that he would use his government contacts to expedite the process and cut through red tape. (Tr. 1131-32.) Second, the stick: a series of implied threats. Meherdad emphasized that he knew everything about Mr. Merchant's family, talking about them in detail. (Tr. 1127.) On two occasions, when meetings were scheduled to occur elsewhere, Meherdad intercepted Mr. Merchant in his neighborhood, near the house where he lived with his wife and daughter. Mr. Merchant understood Meherdad's sudden appearance to be a warning that Meherdad knew where he lived, and that disobedience would lead to consequences for his family. Meherdad drove this implicit threat against Mr. Merchant's family home by making sure Mr. Merchant knew that he always carried a weapon—this notwithstanding that almost nobody in Iran has access to firearms. (Tr. 1127-28.)

In 2023, Meherdad told Mr. Merchant that his first mission was to keep an eye out, during his upcoming business trip to the United States, for people who might be willing to work for Iran. (Tr. 1118.) Mr. Merchant flew first to Texas, where he visited his sister, and then to New York, where he hoped to find customers for his garment business.

Mr. Merchant's friend Nadeem Ali picked him up at the airport when he arrived in New York. Ali was a veteran of the United States military and a vehement supporter of Donald Trump, for whom Mr. Merchant knew him to have voted in 2016 and 2020. During the events underlying this case, Ali also told Mr. Merchant that he supported President Trump during the 2024 election. Mr. Merchant had known Ali for about seven years, since they were introduced by a friend of Ali who happened to have been Mr. Merchant's banking customer before emigrating to the United States. They stayed in contact in the years that followed. Mr. Merchant occasionally loaned Ali money for a cattle business he had in Pakistan, which Ali repaid, and they did each other small favors of the kind common between friends. Whenever Mr. Merchant visited New York, Ali helped him arrange for accommodations, helped him find halal food, and generally made him feel welcomed. They spent a lot of time together during those visits, and Mr. Merchant considered Ali to be a good friend.

Mr. Merchant and Ali stayed in a hotel in New York City together on the night Mr. Merchant arrived. The next day, Ali drove Mr. Merchant to his home in Kingston, where Mr. Merchant was his guest for the next several days, during which Ali introduced him to potential customers for his garment business in New York and Connecticut. Ali also agreed to go into business with Mr. Merchant, planning to import 25,000 T-shirts and resell them to store owners he knew. That deal fell through because Ali was unable to pay a deposit so that Mr. Merchant could have the shirts manufactured and shipped.

Mr. Merchant did not actually seek out people willing to work with Iran during that trip, as Meherdad had tasked him with doing. (Tr. 1118-19.) Instead, upon his return, he provided

Meherdad with a list of some of the people he met or spoke to about other topics. Meherdad was apparently satisfied with that result, because he directed Mr. Merchant to carry out a more serious mission during a business trip to the United States the next year. The Court is fully familiar with the contours of that mission, because it led to Mr. Merchant's arrest and prosecution in this case.

Why did Mr. Merchant agree to engage in the plot that ultimately led to his conviction? The answer lies in Mr. Merchant's well-founded fear that Meherdad or the agency he worked for would harm his wife and child if he refused. As the Government's expert testified, the IRGC is known to be a brutal organization and has killed people that they feel threatened the regime. Indeed, numerous people associated with IRCG have been prosecuted in the Southern District of New York for attempting to kidnap or kill an Iranian expatriate who opposes the regime, demonstrating that the IRGC is more than willing to use violence against those it views as disloyal. *See* United States v. Farahani *et al.*, 21 Cr. 430 (RA); United States v. Shakeri *et al.*, 24 Cr. 670 (LJL). The IRGC is also more than willing to use violence against Iranian citizens it views as disloyal to the state. For example, it was reported that the IRGC massacred more than 36,500 Iranian citizens over the course of just two days in January 2026.[1] Mr. Merchant had every reason to fear that the IRGC would harm his family if it believed he had been disloyal.

On cross examination, Mr. Merchant acknowledged that the United States views the IRGC as a terrorist organization. (Tr. 1166.) He also acknowledged understanding, on the basis of news reports (including a news report that was introduced by the government at trial), that the Iranian government wanted to retaliate against the United States for its drone strike assassination of Iranian general Qassem Soleimani in Iraq in January 2020—the motive to which the government attributes Meherdad's plot. (Tr. 1206-09.) The government argued that Mr. Merchant was motivated by a desire to help avenge the killing of Qassem Soleimani, but that argument, which is based on social media posts that were made years before his involvement in this case, is far-fetched. Your Honor is undoubtedly aware that it is common for people to exaggerate for effect or for clout on social media, or to repost viral memes in the heat of the moment without thinking deeply about their significance. In fact, it is hard to imagine that there is anybody who is active on social media platforms who has not made ill-advised posts that do not reflect their deeply held convictions. Memes that are posted or reposted on social media are not a reliable indicator of anyone's true and lasting opinions, and the fact that Mr. Merchant reposted memes that went viral in the Muslim world after Soleimani's assassination does not suggest, much less prove, that his conduct years later was motivated by a desire to avenge Soleimani.

Mr. Merchant lives in a very different media and cultural environment than most Americans, especially where political relations between the United States and the Muslim world are concerned. Even in the West, the Trump administration's targeted assassination of Soleimani is controversial and presents difficult questions of international law and morality. Many prominent legal scholars and experts in international law believe the killing to be a violation of United States and international law. In the Muslim world, many states (and many individuals) view the killing as illegal, and some even view it as an act of terrorism.

---

[1] "Over 36,500 killed in Iran's deadliest massacre, documents reveal," Iran International, Jan 25, 2026, *available at* https://www.iranintl.com/en/202601255198 (last visited October 23, 2026).

The Soleimani drone strike was the first known incident in modern history in which a nation invoked self-defense as a justification for an attack against a state actor on the territory of a third country. Iraqi prime minister Adil Abdul-Mahdi claimed that Soleimani was in Iraq to respond to a proposal, extended through Saudi Arabia, concerning a resolution of the political conflict between Iran and the United States, and that President Trump personally called him to request that he help mediate that conflict.[2] The Trump administration denied that Soleimani was engaged in peace negotiations when he was killed.

The Trump administration justified the killing as a necessary measure of self-defense in the face of an imminent attack, but the Washington Post and others reported that Trump's true motivation was to exact revenge against Iran for the 2012 Benghazi attack and to counter negative coverage of his 2019 decision to call off an air strike, which he felt made him look weak.[3]

In the aftermath of that unprecedented killing, as legal scholars vehemently debated its legality under United States and international law, the United Nations Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions issued a report condemning the Soleimani killing as a violation of international law, a violation of the territorial integrity of Iraq, and as "not just a slippery slope" but "a cliff" requiring the international community to "now confront the very real prospect that States may opt strategically to eliminate high-ranking military officials in the absence of an obvious war and seek to justify such killings on the grounds that the target was a 'terrorist' who posed a potential future threat."[4]

People in the Middle East were told a very different version of events than people in the West. Beginning in 2009, according to a senior scholar at the Foreign Policy Research Institute, Iran launched a concentrated effort to dominate its internal media environment, concentrating both on pro-Iran messaging and on anti-American, anti-Israel, and broadly anti-Western propaganda. It used its extensive messaging machinery to control the narrative in Iran and across the Arab world in the aftermath of Soleimani's killing, in part by promoting viral memes about Soleimani and Trump on social media, where tens or hundreds of thousands of ordinary people like Mr. Merchant saw and reposted them.[5] News media in Iran and across the Muslim world described the drone strike as a terrorist act, noting that Soleimani had played a critical role in military operations against the Islamic terrorist group Da'esh (also known as ISIS) in Iraq. Pro-

---

[2] Chas Danner, "Iraqi Lawmakers Vote to Expel U.S. Troops As Fallout From Soleimani Strike Worsens," New York Magazine, Jan. 5, 2020 *available at* https://nymag.com/intelligencer/2020/01/iraqis-vote-to-expel-u-s-as-soleimani-fallout-worsens.html (last visited October 22, 2026).

[3] Missy Ryan, Josh Dawsey, Dan Lamothe and John Hudson, "How Trump decided to kill a top Iranian general," The Washington Post, Jan. 4, 2020, *available at* https://www.washingtonpost.com/national-security/how-trump-decided-to-kill-a-top-iranian-general/2020/01/03/77ce3cc4-2e62-11ea-bcd4-24597950008f_story.html (last visited October 22, 2026).

[4] United Nations General Assembly, Human Rights Council, "Use of Armed Drones for Targeted Killings," Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions (Distr. Aug. 15, 2020) at 15-16 *available at* https://docs.un.org/en/A/HRC/44/38 (last visited October 22, 2026).

[5] Patrick Tucker, "Iran Is Expanding Its Online Disinformation Operations," Defense One, January 9, 2020, *available at* https://www.defenseone.com/technology/2020/01/iran-expanding-its-online-disinformation-operations/162357/ (last visited October 23, 2026); Jeff Stone, "Pro-Soleimani messaging immediately floods Twitter following general's death in drone strike," Cyberscoop, January 3, 2020, *available at* https://cyberscoop.com/soleimani-twitter-revenge-campaign-disinformation/ (last visited October 23, 2026)..

Soleimani propaganda describing him as a beloved hero flooded social media in Iran and globally.[6] The Republic of Iran criminally indicted Trump, former Secretary of State Mike Pompeo, and former U.S. Central Command Commander Kenneth F. McKenzie for their roles in the Soleimani killing, asserting that the defendants' "terrorist" activity constituted a waiver of sovereign immunity—exactly the same argument the United States has made when charging officials of states it regards as sponsors of terrorism.[7]

Mr. Merchant has spent a lifetime immersed in a very different media and political environment than most Americans. As a result, he has a very different understanding than most Americans about whether the Trump administration's targeted killing of Soleimani was an act of self-defense or an act of terrorism. Indeed, many in Pakistan oppose the American and Israeli governments as received wisdom. Although his perspective is alien to most Americans, it is commonplace in the Muslim world—even among people, like Mr. Merchant, who generally do not support violence and who do not view the United States as an ideological enemy. From Mr. Merchant's perspective, it was morally and logically reasonable to take the risk that Trump would be harmed or killed if he proceeded—even though that was not his desired outcome—when the alternative was the near certainty that Mr. Merchant's wife and daughter would be harmed or killed if he refused. Mr. Merchant's difference in perspective does not excuse his admitted conduct, but acknowledging that difference in viewpoint is nevertheless critical in understanding both Mr. Merchant's character and the nature and circumstances of his offense.

The government asserts that Mr. Merchant's expressed fear for his family and hope that Meherdad's plot would fail are lies, pointing to the fact that he did not affirmatively go to law enforcement to report the plot after arriving in the United States. But it is not surprising that Mr. Merchant chose his family over strangers when weighing the risks of proceeding with Meherdad's plot against the risks of backing out. Indeed, the Government's refusal to provide him with any credit for having proffered and truthfully disclosed all that he knows about the plot charged in this case, and its subsequent leaking of the details of his proffer, prove that Mr. Merchant's distrust of the United States government was well-placed. Notwithstanding his understandable initial distrust of the government, Mr. Merchant proffered extensively and truthfully about his conduct in the days after his arrest, just as he truthfully testified about his conduct at trial. The Court accordingly should reject the Probation Department's erroneous description of him as unrepentant and as having an "untethered alliance" to the IRGC.

In considering why Mr. Merchant decided not to go directly to law enforcement in the United States and disclose the details of his mission it is important to remember that before he flew to the United States in 2024, Meherdad told him that he would be watched throughout his trip. (Tr. 1140.) Mr. Merchant understood, from the "mission" on which Meherdad dispatched him in 2023, that Meherdad had or was establishing a network of agents in the United States. Mr. Merchant also had reason to believe that network included airport employees: when Mr. Merchant included an airport employee on the (bogus) list of possible recruits he passed to Meherdad in 2023, Meherdad remarked that airport workers could be useful. Thus, when Mr.

[6] Jeff Stone, *supra* n. 6.

[7] Faramarz Davar, "Iran Prosecutes Trump and Pompeo for Role in Soleimani Assassination," IranWire (September 10, 2024), *available at* https://iranwire.com/en/politics/133778-iran-prosecutes-trump-and-pompeo-for-role-in-soleimani-assassination/ (last visited October 22, 2026).

Merchant was called aside for questioning on arrival at the airport in Texas, he could not be certain whether or not he was being watched, and if he surrendered upon arrival, how quickly Meherdad would know. Mr. Merchant's paranoia about Meherdad's reach was intentionally induced. When Meherdad told Mr. Merchant he would be watched, his purpose was to make sure Mr. Merchant would not be tempted to change course once he was outside Meherdad's direct control. And the paranoia Meherdad induced had its desired effect: Mr. Merchant could not be sure whether any approach to law enforcement officer would trigger a threat to his wife and child's safety. The only safe course was the one he pursued: to continue in the plot, even at the risk it might succeed, while hoping and expecting to be arrested. (Tr.1139.) Indeed, only by being arrested after appearing to make efforts to follow through on Meherdad's orders could he avoid his greatest fear, that his wife and child would be subjected to the full horrors of the Iranian regime. Indeed, Mr. Merchant's fears may have been realized. After a United States Senator publicly revealed Mr. Merchant's proffers, Mr. Merchant's family in Pakistan were no longer able to make contact with his wife in Tehran. To this day it is not known whether his wife and daughter in Teheran are alive and well.

Finally, in considering the nature and circumstances of the offense, the Court should recognize the ineptitude displayed by Mr. Merchant's mission and the possibility that the IRGC never expected it to succeed. Mr. Merchant was given less than twenty hours of training before being dispatched to a country where he knew almost nobody other than family members and a Trump-supporting United States military veteran. Even though the IRGC ostensibly possesses networks of operatives and supporters in New York and elsewhere, a fact established by the Government's prosecutions of some of those operatives and supporters in other cases, Mr. Merchant wasn't given the names of anyone he could contact for assistance. Instead, he had to rely for assistance on Nadeem Ali, his only friend in New York, whom he knew to be a Republican, a military veteran, and a Trump supporter—hardly the kind of candidate an experienced, competent intelligence agent would attempt to recruit to participate in a plot to assassinate a prominent political figure in revenge for the Soleimani assassination. Although Mr. Merchant has no criminal history and no connection to organized crime or the criminal underworld, he was directed to find and hire "mafia" members to commit a variety of serious crimes. In fact, when Mr. Merchant met with the undercover agents posing as American Mafia members, he failed to employ any of the skills a trained intelligence operative would use to protect himself. Moreover, throughout his trip to the United States in Spring 2024, Mr. Merchant never sought to elude the surveillance that he and Ali knew were watching their every move.

Finally, in evaluating the seriousness and viability of the plan that Mr. Merchant was sent to execute, it is important to consider that although the IRGC enjoys enormous financial resources, sufficient to fund insurgent groups in several countries, Mr. Merchant was not given a single dollar to retain any Mafia members he might successfully recruit. Instead, when he had to come up with the paltry sum of $5,000 as a token of respect for the "hired killers" Ali introduced him to, Mr. Merchant had to reach out to several friends and family members, none of whom had money to loan him, before his uncle eventually made contact with a cousin who agreed to loan Mr. Merchant the money. Under these circumstances, it is reasonable to question whether Meherdad or the IRGC ever intended or expected the plot to succeed, or whether they instead staged it for propaganda purposes. When Mr. Merchant's arrest became public, the IRGC's reach into the United States, and the danger the IRGC poses to prominent American politicians, received breathless coverage in the media. Although the IRGC doubtless would have been pleased if Mr. Merchant succeeded, the boost to the IRGC's reputation for power and influence

in the West that media coverage of Mr. Merchant's arrest provided might have been exactly what Meherdad and the IRGC hoped for when he assigned Mr. Merchant his mission. In that respect, Mr. Merchant was a disposable dupe, used by the IRGC to wreak havoc on the American political system during an election year, with no expectation that the ill-conceived and executed plot would succeed. Mr. Merchant's conduct undeniably would have created a significant risk to public safety if it had succeeded, but the vanishingly low probability that such an inept plot would ever come close to fruition is nevertheless worthy of consideration when determining what sentence to impose.

### C. The §3553(a) Factors Support a Substantially Reduced Sentence

As the Supreme Court has repeatedly explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Peugh v. United States*, 569 U.S. 530, 536, 133 S. Ct. 2072, 2080 (2013) (*quoting Gall v. United States*, 552 U.S. 38, 49 (2007)). In this case, the Probation Department has calculated that Mr. Merchant's guidelines range is life imprisonment.

After calculating the appropriate guidelines range, the Court must apply certain considerations set forth in 18 U.S.C. § 3553(a), make an individualized assessment, and impose a sentence that is "sufficient, but not greater than necessary" to meet the objectives of federal sentencing. *See* 18 U.S.C. § 3553(a); *Gall v. United States, supra.* It is respectfully submitted that the §3553(a) factors counsel in favor of a sentence substantially below the life imprisonment recommended by the advisory sentencing guidelines and below the cumulative 30 years recommended by the probation department.

It is indisputable that Mr. Merchant's crimes of conviction are very serious and deserving of punishment, but it is respectfully submitted that a sentence below the cumulative 30 years recommended by the Probation Department would be sufficient to reflect the seriousness of the offenses, promote respect for the law and provide just punishment. Although Mr. Merchant participated in Meherdad's plot, he did not conceive of the plot or choose the political figure to be targeted. Moreover, as Mr. Merchant testified at trial, his participation in the plot was not voluntary, although his failure to go directly to law enforcement in the United States to disclose the plot disqualified him from asserting a duress defense. If not for his fear that the IRGC would harm his family in Iran, Mr. Merchant would never have participated in Meherdad's hare-brained scheme, and the evidence points to the fact that Mr. Merchant had no actual intent to see a political killing occur in this country. Although when he traveled to the United States, he recognized that it was possible the plot would succeed, upon his arrival he knew that he was under constant surveillance by law enforcement, he expected to be caught and planned to confess everything to the Americans when arrested. And indeed, when he was arrested, he proffered extensively and ultimately told the prosecutors and agents handling this case everything he knew about the plot. That he did not immediately reveal every detail he knew is not unusual. He was a foreigner who was unfamiliar with the American legal system and was first interviewed without a lawyer and with no assurances that his family would be cared for. Further, as this Court well knows, and as prosecutors and defense attorneys know very well, proffers are a process and it often takes time to develop the relationship of trust necessary for a full and fulsome proffer of every relevant fact. Moreover, the government ignores the fact that Mr. Merchant proffered over many hours over the course of several days, sometimes into the early hours of the morning.

A thirty-year sentence would also be greater than necessary to achieve the goals of individual and general deterrence. Mr. Merchant was in the United States on a visa when he was arrested. He will be deported upon completing his sentence, and he will never be permitted to return to the United States. From the moment of his arrest, he has been kept largely isolated from the outside world, allowed to meet with and speak only to his legal team and once a month with his family in Pakistan, in telephone conversations monitored by government agents. The special administrative measures governing his conditions of confinement are the most severe imposed on inmates in the federal system and it is not an exaggeration to call them inhumane. Moreover, whatever sentence Mr. Merchant receives will be heavily punitive, as he likely will be sent to a super-max facility, and the special administrative measures to which he is subject will guarantee that his isolation in jail will continue for years to come. Furthermore, because his proffers became public knowledge during trial, he will be *persona non grata* in Iran, where he will be viewed as a traitor for having revealed the IRGC's role in his offenses of conviction. He also faces a difficult reality when he returns to Pakistan because his involvement with Iran will be known by the Pakistani government. Accordingly, there is no possibility that he will be able to commit a similar offense in the future even if he were inclined to do so—which he is not. Finally, Mr. Merchant will likely be in his late sixties or older by the time of his release, further reducing the likelihood that he will reoffend.

As for deterring others who may consider committing similar crimes, this case is a uniquely inappropriate vehicle for attempting to achieve general deterrence. Mr. Merchant was coerced into engaging in the plot hatched by Meherdad and the IRGC and never would have agreed to participate if not for the fear that his family would be harmed. He faced a "Hobson's Choice" that those of us living in the free world can hardly conceive of. Our justice system may not recognize the coercion he experienced and the duress he felt as a legal defense to the crimes charged, but it should recognize that others facing similar choices in the future are not likely to be deterred by the prospect of a lengthy prison sentence. Given the choice of protecting the lives of one's family or going to jail for a long time, many if not most people are likely to sacrifice their own interests to protect their family and loved ones.

Finally, the cumulative sentence of 30 years recommended by the Probation Department would result in an unwarranted disparity among the sentences imposed on similarly-situated defendants for similar conduct.

Mr. Merchant was convicted at trial of murder for hire in violation of 18 USC § 1958 and of attempt to commit an act of terrorism transcending national boundaries in violations of 18 USC § 2332b. The probation department recommends a 10-year sentence for Mr. Merchant's violation of the murder for hire statute, and indeed defendants convicted of murder for hire commonly receive a sentence of ten years, the statutory maximum, for that offense. *See*, *e.g.*, *United States v. Amirov*, No. S8 22 CR 438 (CM), 2025 WL 3028334 (S.D.N.Y. Oct. 29, 2025) (S.D.N.Y. Oct. 29, 2025) (imposing, *inter alia*, ten-year sentences for murder for hire on agents of a foreign government who were convicted of murder for hire; intended victim was an Iranian political figure). However, the cumulative 30-year sentence the Probation Department recommends for both of Mr. Merchant's convictions would be a longer cumulative sentence than courts in the Second Circuit have imposed for similar conduct. *Amirov*, for example, involved members of a Russian organized crime gang who agreed to murder an Iranian dissident in the United States at the behest of the IRGC. Their plot developed so far that an armed participant was waiting at the target's residence. The defendants were convicted of murder for hire,

conspiracy to commit murder for hire, attempted murder in aid of racketeering, money laundering, and a Section 924c violation carrying a mandatory five-year consecutive sentence. They were convicted on all counts at trial for what Judge McMahon described as "a politically motivated assassination attempt perpetrated at the behest of the Government of Iran." In determining what sentence to impose, Judge McMahon found it "highly relevant that this [politically motivated assassination] was a cross-border crime," and that the defendants were "foreign citizens who were agents of a foreign power [and who] conspired to commit, and tried to commit, and almost succeeded in committing, a murder inside the United States. She imposed 25-year cumulative sentences on the defendants, whose conduct was more serious and more advanced than the conduct proven at Mr. Merchant's trial. *Id.* at *4-*5.

In *United States v. Arbabsiar*, a naturalized U.S. citizen pleaded guilty to murder for hire, conspiracy to commit murder for hire, and conspiracy to commit an act of terrorism transcending national boundaries. *United States v. Arbabsiar*, No. 11 CR. 897 (JFK), 2021 WL 2433757 (S.D.N.Y. June 15, 2021). The charges arose from Arbabsiar's participation in a nearly six-month conspiracy with members of the IRGC to assassinate the Saudi Arabian Ambassador to the United States in Washington, D.C. The murder was intended to be carried out in a crowded restaurant, and Arbabsiar expressed indifference to the likely killing of 100 to 150 bystanders, including United States Senators. The court imposed a cumulative sentence of 25 years on all three counts and later denied a compassionate release application because "Arbabsiar's crucial role in an outrageous plot by a foreign power hostile to the United States to assassinate a foreign diplomat on American soil" overshadowed the need to provide the defendant with necessary medical care. *United States v. Arbabsiar* at *4.

Some facts of *Amirov* and *Arbabsiar* are substantially similar to the facts of this case, though the statutes charged alongside murder for hire in the three cases differ. Arbabsiar and the two defendants in *Amirov*, like Mr. Merchant, engaged in international and interstate commerce on behalf of the IRGC and in furtherance of the IRGC's efforts to kill a prominent person who had offended the Republic of Iran. All three schemes had political aims. Arbabsiar, like Mr. Merchant, was recruited by a cousin who worked for the IRGC to participate in a plot that would have "severely impacted international and diplomatic relationships of the United States" if it had succeeded. (Gov't Sent. Sub., ECF 56 in *US v. Arbabsiar*, 11 Cr. 897 (JFK), at 2, 14.) Arbabsiar, like Mr. Merchant, proffered extensively after his arrest; unlike Mr. Merchant, Arbabsiar's proffer was incomplete and he subsequently perjured himself about the circumstances of his proffer. (11 Cr. 897, ECF 56 at 19-20.)

Despite these similarities, the facts in Mr. Merchant's case support a lesser sentence than the 25-year sentences imposed in *Amirov* and *Arbabsiar*, for at least two reasons. First, the *Amirov* defendants were career criminals and members of a violent criminal organization that "committed numerous serious crimes, including theft, extortion, assault, kidnapping and murder, over the course of many years." *Amirov*, 2025 WL 3028334, at *4. Arbabsiar, for his part, was at a minimum associated with people he understood to be narcotics traffickers who brought drugs from Mexico into the United States and whom he believed could commit a murder on behalf of the IRCG. (11 Cr. 897, ECF 56 at 2.) Mr. Merchant, by contrast, has no criminal history and has never associated with criminals. Second, the plots in *Amirov* and *Arbabsiar* were far more advanced than the evidence at trial showed Meherdad's plot to be. Both of those plots were sufficiently advanced to have an identified intended victim who was to be killed by a specific means, by a specific person, at a specific location, for an agreed-upon price (*Arbabsiar*, 11 Cr.

897, ECF 56; *Amirov*, 22 Cr. 438, ECF 157.) In this case, by contrast, there was no identified victim and no specific plan beyond, at most, an agreement to work out details at some future date. It is respectfully submitted that these distinctions support the imposition of a lesser sentence in this case than the 25-year sentences that were imposed in *Amirov* and *Arbabsiar*.

## Conclusion

For the reasons discussed above and based on the authorities cited herein, the Court should temper justice with mercy and impose on Mr. Merchant a sentence substantially lower than the 30-year cumulative sentence recommended by the Probation Department.

Thank you in advance for your consideration of this letter.

Respectfully submitted,

/s/

Avraham C. Moskowitz
Christopher R. Neff
Joshua J. Lax

cc: AUSA Sara Winick (by email)
AUSA Gilbert Rein (by email)
AUSA Nina Gupta (by email)