**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NJM:SKW/GMR
F. #2023R00922

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 3, 2026

By E-mail and ECF

The Honorable Eric R. Komitee
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Asif Raza Merchant
Criminal Docket No. 24-362 (EK)

Dear Judge Komitee:

The government respectfully submits this memorandum in advance of the sentencing hearing scheduled for November 17, 2026. For the reasons detailed below, the government respectfully recommends that the Court sentence the defendant to life imprisonment on Count One and a consecutive sentence of 10 years' imprisonment on Count Two. Any sentence less than life imprisonment, which is the applicable sentence under the United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines"), would utterly fail to adequately punish the defendant for his brazen attempt to orchestrate a politically motivated assassination in United States or deter others from attempting similar attacks on behalf of terrorist organizations.

## I. Factual Statement

The defendant—an intelligence operative of the Islamic Revolutionary Guard Corps ("IRGC")—was convicted at trial of attempting to commit an act of terrorism transcending national boundaries and murder for hire. By his own admission, the defendant volunteered to join the IRGC and became a trained intelligence asset. Tr. 1108, 1167.[1] He then traveled to the United States and, on behalf of the IRGC, located and paid hitmen to kill United States government officials on American soil. Tr. 1118-19, 1132. The defendant believed that the ultimate target of his murder plot would be then-candidate, now President, Donald J. Trump, but stated that other targets could have been then-President Joe Biden and former United Nations Ambassador Nikki Haley, all of whom were United States presidential candidates at the time. Tr. 1132, 1206. The

[1] References to "Tr." and "GX" refer to the transcript and government exhibits, respectively, from Merchant's trial. References to the "PSR" refer to the Pretrial Investigation Report dated October 13, 2026 prepared by the U.S. Probation Office.

defendant admitted that the murder plot was motivated by Iran's desire to avenge the death of former IRGC commander Qasem Soleimani. Tr. 1206. Contrary to the flippant tone of the defendant's sentencing submission, the defendant testified at trial that he believed the hitmen he hired were real killers and that he thought his plot could succeed. Tr. 1148, 1161.

As the defendant admitted in his trial testimony, the defendant was a Pakistani citizen who was recruited by the IRGC in approximately 2022. Tr. 1101, 1108. Before being recruited by the IRGC, the defendant graduated college, obtained a master's degree in business administration, had several high-level management jobs at banks in Pakistan, and then transitioned into the import/export business, which the defendant testified was successful. See generally, Tr. 1103-08.

In approximately 2022, the defendant began traveling to Iran on religious pilgrimages and, through a relative, was introduced to his IRGC handler, Yousef Merhardad. Tr. 1108-11. The defendant admitted that, beginning in approximately 2023, he traveled to Tehran, Iran, approximately every other month and met with his IRGC handler at an IRGC safehouse. Tr. 1116, 1170. The defendant estimated that he met his IRGC handler approximately 15 times over the course of a year and a half; during that time the IRGC handler trained the defendant on counterintelligence measures. Tr. 1116-17, 1168-74. The IRGC handler called the defendant by a code name, "Amer," which was after the defendant's martyred brother, as is a typical practice of the IRGC. Tr. 1167, 1240. Each time the defendant met with his IRGC handler, the defendant was instructed to take the batteries out of his phone and store his phone in a secure bag before covertly traveling to the IRGC safehouse. Tr. 1169-70. Once at the safehouse, the defendant learned surveillance and countersurveillance measures, received IRGC taskings, and was trained on how to plan an assassination plot in the United States. Tr. 1170-74.

At first, the IRGC handler instructed the defendant to travel to the United States and return with a list of individuals in the United States that the defendant believed could be useful to the IRGC. Tr. 1200. The defendant admitted that he provided a list to the IRGC, which, among other names, included one of the defendant's acquaintances who worked at an airport in Texas. Tr. 1201. The defendant admitted that he provided the individual's name to the IRGC because he thought the individual could be "useful to us," meaning the IRGC, because of the individual's level of access at the airport. Tr. 1201-02. While in the United States, the defendant created a cover business importing garments, which his IRGC handler told the defendant would help hide his true reason for traveling to the United States. Tr. 1202.

Then, in approximately early 2024, the IRGC tasked the defendant with traveling to the United States to orchestrate a plot to assassinate United States government officials or politicians. Tr. 1160, 1204. The defendant was instructed that hitmen he hired to commit the killings should be criminals or mafia members and that they should carry out the assassination at a political rally in America. Tr. 1126, 1160. The defendant also was told that the hitmen should plan a protest at the political rally as a distraction and then shoot the official at the podium. Tr. 1160-61, 1171. To train the defendant on how to carry out the plot, the IRGC handler drew a political rally on a whiteboard and showed the defendant which angles he should instruct the hitmen to shoot from in order to kill the politician at the podium. Tr. 1171-73. The defendant was told that he should put all the pieces in place to carry out the plot while in the United States and then return to Iran where the IRGC would provide the name of the target once the defendant was

safely outside America. Tr. 1164-65. In addition, the defendant was told the target would be someone like President Trump, President Biden, or Ambassador Haley. Tr. 1132. The defendant admitted that he knew Iran wanted to avenge General Soleimani's death, Tr. 1206, and believed his ultimate target was then-former President and Presidential Candidate Trump, Tr. 1238. In addition to the murder plot, the defendant's IRGC handler told him that the hitmen also may be used to steal important documents but did not identify what type of documents. Tr. 1204.

In approximately April 2024, immediately after spending a week in Iran, the defendant flew to Turkey and then to the United States to carry out his plot. Tr. 1124-26. While in the United States, in furtherance of his plot to assassinate U.S. government officials, the defendant repeatedly searched on his electronic devices for terms such as "republican party election," "republican party election campaign," "trump upcoming events," and "america election," among other searches. GX 1201.1; Tr. 985-86. The defendant also learned the location of a Trump campaign rally in New Jersey and then searched the address of that rally on Google Maps. GX 1201.3; Tr. 988. Some of the defendant's internet searches related to Trump campaign rallies just between May 1, 2024 to May 10, 2024 are reflected in the exhibit below.

Microsoft Bing

| Date | Time (UTC) | Search Term |
|---|---|---|
| 5/1/2024 | 9:12:23 PM | trump upcoming events |
| 5/1/2024 | 9:13:54 PM | trump upcoming events |
| 5/1/2024 | 9:41:55 PM | trump upcoming events |
| 5/8/2024 | 5:59:34 PM | trump upcoming events |
| 5/8/2024 | 5:59:40 PM | trump upcoming events |
| 5/8/2024 | 5:59:52 PM | trump upcoming events |
| 5/10/2024 | 1:12:54 AM | trump upcoming events |
| 5/10/2024 | 1:12:56 AM | trump upcoming events |
| 5/10/2024 | 1:13:04 AM | trump upcoming events |
| 5/10/2024 | 6:06:39 PM | trump upcoming events |
| 5/10/2024 | 6:07:30 PM | trump upcoming events |
| 5/10/2024 | 6:11:24 PM | trump upcoming events |
| 5/10/2024 | 6:12:34 PM | trump upcoming events |
| 5/10/2024 | 6:14:06 PM | trump upcoming events |

GX 1201.1.

After arriving in the United States, the defendant reached out to his acquaintance, Nadeem Ali,[2] to assist in the assassination plot. Tr. 1141-42. Ali, however, voluntarily reported his interactions with the defendant to the FBI and agreed to record his phone calls and meetings with the defendant. Tr. 38. As reflected in audio recordings and video, beginning on approximately June 3, 2024, the defendant revealed to Ali his plot to hire hitmen to assassinate government officials in the United States. Tr. 103-04, 113-16. The defendant explained that he wanted Ali to help hire professional hitmen to kill a government official or "political person" at a political rally. Tr. 134-35. Just as his IRGC handler taught him on the whiteboard in Tehran, the

[2] "Nadeem Ali" is an alias that the Court permitted the government to use.

defendant showed Ali how he wanted the murder to occur by plotting out the killing on a napkin using objects to symbolize the target at a rally. Tr. 140. Below is a still image from a video recording of the defendant plotting the political assassination.




GX 602.

To successfully execute the plot, the defendant explained that they would need to use untraceable phones and code words so as not to get caught. Tr. 146, 178-79. The defendant also explained his motive to Ali, stating that the killing was justified because the people they planned to target were "hurting Pakistan and the world, the Muslim world. These are not normal people." Tr. 181.

After reading Ali into the scheme, the defendant took Ali to a club to try to recruit others to assist them. Tr. 194. The defendant also tasked Ali with finding hitmen to carry out the assassination. Tr. 1158-60. Working with law enforcement, Ali introduced the defendant to purported hitmen who were actually undercover FBI agents. Tr. 242-43, 1160-61. The defendant met three times with the purported hitmen and explained to them that he was working with people overseas and wanted to hire the hitmen to kill a politician, as well as steal documents and stage protests. GX Tr. 256-59, 501. The defendant explained that his work with the purported hitmen would be long term and not a one-off job. Tr. 169. The defendant then paid the purported hitmen $5,000, which the defendant obtained with the assistance of overseas relatives, as an initial payment for the murder plot. Tr. 289, 516. After receiving the money, one of the purported hitmen stated, "Now we're bonded together." GX 610, Tr. 516. The defendant agreed, "Yes." GX 610. The hitman continued, "Now, we know we're going forward. We're doing this." GX 610, Tr. 516. In response, the defendant said "Yes. Absolutely." GX 610. Below is an image of the money that the defendant paid the purported hitmen.




GX 526.

While in the United States, the defendant also covertly communicated with his IRGC handler about his progress. Tr. 1204-05, 1244-45. Instead of communicating electronically, which risked their plot being foiled, the defendant secreted a status report in a gift bag which he gave to an acquaintance to carry on a flight from the United States to Pakistan. Tr. 1150-51, 1204-05. The defendant then instructed his acquaintance to give the gift bag to his daughter in Pakistan. Tr. 1151, 1250. While in the United States, the defendant also instructed his daughter in Pakistan to text his IRGC handler on the defendant's behalf from a cell phone the defendant hid in his Pakistani home. Tr. 1250.

Ultimately, the defendant's murder plot was disrupted, and he was arrested on July 12, 2024, as he was about to go to the airport to leave the country. See ECF 5; Tr. 618-19. The defendant was charged in a two-count indictment with attempt to commit an act of terrorism transcending national boundaries, in violation of Title 18, United States Code, Section 2332b, and murder for hire, in violation of Title 18, United States Code, Section 1958(a). See ECF 16.

The day after the defendant was arrested, there was a separate assassination attempt against President Trump at a campaign rally. Tr. 1224. Further confirming that a political assassination was the defendant's ultimate goal and that President Trump was the defendant's intended target, after being told about the July 13th assassination attempt, the defendant told law enforcement agents that the assassination attempt that occurred was "the same thing he was sent here to do." Tr. 1264. The defendant then proffered multiple times with the government but, contrary to the defendant's claim in his sentencing submission, repeatedly lied to the government before ultimately admitting to parts of his scheme while denying other parts. Tr. 1264-65.

Following his arrest, the defendant was brought to the Eastern District of New York, where he stood trial and testified in his own defense. Throughout his testimony, the defendant showed no remorse for his plot. The defendant's testimony confirmed repeatedly that he was working on behalf of the IRGC to assassinate government officials and commit other crimes in the United States. After a two-week trial, the defendant was convicted of both counts in the indictment.

II. Applicable Law

Title 18, United States Code, Section 3553(a) requires a sentencing court to "determine in each case what constitutes a sentence that is 'sufficient, but not greater than necessary,' to achieve the overarching sentencing purposes of 'retribution, deterrence, incapacitation, and rehabilitation.'" Rosales-Mireles v. United States, 138 S. Ct. 1897, 1903 (2018) (quoting 18 U.S.C. § 3553(a) and Tapia v. United States, 564 U.S. 319, 325 (2011)). "[I]n determining the particular sentence to be imposed" the Court is required to consider both the sentencing factors set forth at § 3553(a)(2), as well as the sentencing range established by the Sentencing Commission for the applicable category of offense and offender. See 18 U.S.C. § 3553(a)(4). Thus, "[a] district court is procedurally obligated to calculate and consider the Sentencing Guidelines in reaching an independent decision as to sentence," United States v. Awan, 607 F.3d 306, 312 (2d Cir. 2010), and "[a] district court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range," which "provide the 'starting point and the initial benchmark' for sentencing." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting Gall v. United States, 552 U.S. 38, 49-50 (2007)).

Although the Sentencing Guidelines are advisory, see United States v. Booker, 543 U.S. 220 (2005), "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)" in determining what sentence to impose, see United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).

As mentioned, after determining the applicable Guidelines range, the Court must turn to the factors set forth in Title 18, United States Code, Section 3553 which include the need for the sentence:

a) to reflect the seriousness of the offense, to promote respect for the law, and to
b) provide just punishment for the offense;
c) to afford adequate deterrence to criminal conduct;
d) to protect the public from further crimes of the defendant; and
e) to provide the defendant with needed educational or vocational training, medical
f) care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2); see also Booker, 543 U.S. at 260. In addition to these factors, the Court must also consider the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the kinds of sentence and the sentencing range established in the Guidelines; any pertinent policy statements from the United States Sentencing Commission; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims. 18 U.S.C. § 3553(a).

III. Sentencing Guidelines

The government and Probation agree that the defendant's sentencing Guidelines range is life imprisonment. See PSR ¶¶ 75-77. The government submits that the PSR correctly sets forth the applicable Guidelines calculation, which is reflected below. Id. ¶¶ 35-43.

Counts One and Two[3]

| | | |
|---|---|---|
| Base Offense Level (U.S.S.G. § 2A1.5)[4] | | 33 |
| Plus: | Offense involved receipt of anything of pecuniary value (U.S.S.G. § 2A1.5(b)(1)) | +4 |
| Plus: | Victim was a government official and offense was motivated by victim's position (U.S.S.G. § 3A1.2(b)) | +6 |
| Plus: | Terrorism Enhancement (U.S.S.G. § 3A1.4(a)) | +12 |
| **Total:** | | **55** |

Because the defendant's offense level is 55, which exceeds the maximum level in the Guidelines Sentencing Table, the Guidelines treat the defendant's total offense level as 43. Id. ¶ 44. The defendant is in Criminal History Category VI because his offense was intended to promote a federal crime of terrorism. Id. ¶ 48; U.S.S.G. § 3A1.4(b). Thus, with a total offense level of 43 and a Criminal History Category VI, the defendant's advisory Guidelines sentencing range is life imprisonment. PSR ¶ 77.

The sentence imposed for Count One must run consecutively to the sentence imposed on Count Two, and, Count Two has a ten-year statutory maximum sentence. See 18 U.S.C. §§ 1958(a) and 2332b(c)(2); PSR ¶¶ 75-76.

IV. Only a Sentence of Life Imprisonment Will Achieve the Statutory Objectives of Sentencing

As the Probation Department recognized in its sentencing recommendation, the defendant's politically motivated plot to assassinate U.S. government officials was motivated by "vengeance" and is among the "most heinous crimes brought before the Court." See U.S. Probation Recommendation dated October 13, 2026 ("Recommendation"). The defendant, who remains "unrepentant," see id., and was ideologically motivated to kill government officials on behalf of the IRGC, remains a serious risk of danger. The government has carefully considered the facts of this case and the full range of factors that the Court must consider at sentencing under 18 U.S.C. § 3553(a) and respectfully submits that a sentence of life imprisonment on Count One followed by a consecutive term of 10 years' imprisonment on Count Two is sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case. See 18 U.S.C. § 3553(a).

---

[3] Counts One and Two are "grouped" for the purposes of calculating the defendant's sentencing Guidelines. See PSR ¶ 34.

[4] As indicated in the PSR, the total Guidelines calculation would be the same if U.S.S.G. § 2A2.1 was used as a base offense level. See PSR ¶ 34, fn. 1.

As the Probation Department correctly noted, there are "no mitigating factors to speak of." Recommendation at 2. Further, "the Guidelines . . . appropriately reflect Congress's considered judgment that terrorism is different from other crimes." See United States v. Mumuni Saleh, 946 F.3d 97, 112 (2d Cir. 2019).

Any sentence that does not ensure the defendant spends the rest of his life in jail would be insufficient to punish the defendant, protect the public, or promote specific and general deterrence.

a. The Nature and Circumstances of the Offense

On behalf of a terrorist organization, the defendant plotted a political assassination and acknowledged that he believed the target would ultimately be a former sitting president of the United States, who was at the time a presidential candidate. To that end, the defendant took concrete steps to execute his plan. Among other things, the defendant created a cover business, traveled to the United States, recruited Ali, hired hitmen, obtained money from overseas, paid the hitmen, Googled and located campaign rallies, sent a covert message back to his IRGC handler, and then fled the country so he could give the "ok" far from the judicial reach of the United States. Only because of the vigilance of law enforcement officers and the bravery of one citizen who came forward to assist was the defendant's plot foiled. Had it been successful, however, the defendant's terrorist attack would have caused the tragic loss of life and political turmoil, which was the defendant's goal. "Congress and the United States Sentencing Commission, 'plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to whether due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences." Saleh, 946 F.3d at 113 (citation omitted). That is exactly the case here.

As an IRGC asset, the defendant worked to further the objectives of a hostile foreign power and one of the world's most dangerous terrorist organizations, which has the blood of U.S. citizens on its hands. See, e.g., Rimkus v. Islamic Republic of Iran, 750 F. Supp. 2d 163, 168 (D.D.C. 2010) (setting forth prior district court findings that Iran and the IRGC were responsible for the Khobar Towers bombing which killed U.S. service members). As a result of its ongoing terrorist activity and the threat it poses to U.S. national security, the State Department designated the IRGC as a foreign terrorist organization in April 2019. See 84 Fed. Reg. 15278-01 (Apr. 15, 2019); see also Tr. 862 (testimony of Dr. Matthew Levitt). The IRGC and its components are tasked with conducting lethal operations outside of Iran against what the Iranian regime perceives to be its enemies. This includes terrorist attacks in the Middle East and throughout the world. The IRGC seeks to accomplish its objectives "through intelligence activities and surveillance, through intimidation . . . kidnapping and assassination." Tr. 864.

As the Probation Department stated, the IRGC's "commitment to strike at the heart of our democracy and wage terror on the American people is a real and ongoing threat that cannot be overstated." See Recommendation at 2. "Terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the defendant." Saleh, 946 F.3d at 113 (quoting United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003). The fact that the defendant shared the IRGC's motives and worked on their behalf is an aggravating factor which warrants the maximum sentence.

The defendant's claim that his plot was "so poorly conceived and executed" that neither he nor the IRGC actually intended it to succeed, see Def. Ltr. 1, 9; is plainly contradicted by the evidence at trial, including the defendant's own statements and expert testimony. Notably, the defendant testified that he believed the hitmen he paid were real hitmen and thought that it was possible they would be able to successfully commit the assassination. Tr. 1148, 1161. In addition, Dr. Matthew Levitt—an expert on the IRGC, including its objectives and external operations—testified that the IRGC regularly engages in plots like this where they recruit English speakers who share their anti-American ideology and task them to create a cover business and travel to the United States to hire hitmen to commit political assassinations. Tr. 864-66 ("In the past, the IRGC has used its own agents, and they have been, in many cases, arrested and tried and jailed, and that was very publicly humiliating. And so what they did is they moved to recruit assets or proxies, people who can operate on their behalf with a little bit of distance, so that these operations can be done with what you might describe as reasonable deniability."). FBI Special Agent Jacqueline Smith also testified that the tradecraft the defendant employed was straight out of the IRGC playbook. Tr. 1256-57. The defendant's attempt to downplay the seriousness of his offense by comparing his terrorist plot to an Inspector Clouseau movie, see Def. Ltr. 1-2, is precisely the response that the IRGC hopes to achieve when risky external lethal operations go awry. In essence, the IRGC recruits many people to accomplish similar ends in the hope that one is successful, and the failed attempts are minimized. The fact that the defendant's attempt did not succeed does not speak to the seriousness of his crime. But, the overall dismissive tone of the defendant's submission does speak to his lack of remorse.

The Court also should not credit the defendant's false claim that he never intended to go through with the murder plot and only participated out of fear for his family in Iran. See Def. Ltr. 1, 5, 10. Contrary to defense counsel's argument throughout the trial, the defendant himself testified that he took enough steps towards the assassination that he thought the plot could succeed. Tr. 1148 ("Q: Did you think that you were actually going to get away with this? A: I was thinking that perhaps that could be possible."). In fact, the defendant actually carried out his part in the scheme by successfully hiring and paying assassins and leaving the country as instructed.

The defendant's claim that he only agreed to the plot because he feared for his family in Iran is similarly manufactured. The defendant never once expressed fear for his family in Iran during multiple proffers with the government after his arrest, raising it for the first time from the witness stand at trial. Tr. 1240. Conversely, the defendant told the government during his proffers that that he voluntarily worked for the IRGC. Id. The defendant also admitted to instructing his Pakistani daughter to covertly communicate with his IRGC handler on the defendant's behalf while the defendant was in the United States executing the scheme. Tr. 1250. The fact that the defendant voluntarily had his daughter communicate with the IRGC on his behalf undermines any claim that the defendant acted out of fear to protect his family—instead, he took steps to increase the frequency of interactions between the terrorist organization and his child. The defendant's claim that he was under duress is nothing more than a continuation of the arguments he made at trial, all of which the jury quickly and decisively rejected. The Court should do the same here.

In sum, the nature and circumstances of the offense present only aggravating factors. The defendant's "unrepentant involvement and untethered allegiance to such a violent

and murderous organization warrants the most severe penalty available," Recommendation at 2, which in this case is life in prison.

b. <u>The History and Characteristics of the Defendant</u>

There are no mitigating factors in the defendant's history or characteristics that warrant a downward variance or a sentence less than life imprisonment. Rather, the defendant's characteristics make clear that his motive was to attack America out of vengeance on behalf of a terrorist organization, a clearly aggravating factor.

As reflected in the PSR and through the defendant's testimony, the defendant was well educated and financially successful. <u>See</u> PSR ¶¶ 64-69. He was raised in a "normal" and "loving" home, had a healthy family of his own as an adult, and did not have mental health or substance abuse issues. <u>Id.</u> ¶ ¶ 55, 62-63. Nevertheless, the defendant chose to risk all of that to plot the murder of a United States government official on behalf of the IRGC.

Contrary to the defendant's claim, the defendant did not suddenly get in over his head with the IRGC. <u>See</u> Def. Ltr. 1, 4, 5, 10. Rather, the defendant's social media posts show that his desire to target America began years before his arrest and at least two years before he testified he was recruited by the IRGC. Notably, on the day General Soleimani was killed in 2020, the defendant shared on Facebook a computer-generated image of President Trump's severed head with the text "coming soon" and "severe revenge" underneath. The defendant also posted an image of General Soleimani with a heart and the text "praise be the martyrs." Both images are below.







GX 225 and 245.

That same day, the defendant shared on Faceook a video stating that "severe revenge awaits the killers of Soleimani." A few days later, the defendant shared a computer generated image of Trump digging his own grave. He continued to share other anti-American images, such as an "X" through an American flag. Both images are below.







These social media posts reveal the defendant's true motive: to kill the person he believed was responsible for General Soleimani's death. Discussing these posts, the defendant claims that "it is hard to imagine that there is anybody who is active on social media platforms who has not made ill-advised posts that do not reflect their deeply held convictions." Def. Ltr. 6. If the defendant were on trial for his posts, that might be a persuasive argument. But while there is no doubt puffery and meme-passing online untethered to real-world violence, the defendant is the rare person who, after posting about his hope that a political leader would die, traveled halfway across the world and made expensive criminal arrangements to try to secure the violent result about which he posted. The defendant was not all talk—he paid thousands of dollars and spent months trying to enable the IRGC to assassinate officials in the United States. His prior posts only explain why.

Indeed, the fact that the defendant was ideologically motived to kill shows that his plot was premeditated and sinister, serious aggravating factors. The defendant's attempts to minimize and provide "proper context" for his conduct are misplaced and should be rejected. See Def. Ltr. 4. First, there can be no "proper context" for agreeing to work for a violent foreign terrorist organization for the purpose of murdering American leaders. Such conduct is plainly wrong, and the defendant justifiably faces a life sentence for his efforts on behalf of the IRGC. Second, the defendant's suggestion that his affiliation with the IRGC was more one of necessity than ideology is belied by the overwhelming evidence admitted at trial of his hatred of America and President Trump.

Further, the defendant's arguments about the legality of General Soleimani's killing in a U.S. drone strike and world opinion about it are nothing more than a distraction from his own serious conduct. See Def. Ltr. 7. The defendant engaged in an assassination plot. That is inexcusable. His radical views, even if influenced by the propaganda efforts of a hostile foreign power, are an aggravating factor, not a mitigating one. What is more, even deeply held convictions never justify violence or terrorism.

Moreover, the defendant's letter falsely implies that the defendant agreed that the IRGC was a terrorist organization, see Def. Ltr. 6, when really the defendant only acknowledged that the United States views the IRGC as a terrorist organization, Tr. 1166. The defendant's refusal

to say he, himself, believes the IRGC is a terrorist organization further solidifies the defendant's extremist motives, which weigh heavily in favor of a serious sentence.

c. The Purpose of Sentencing

The government respectfully submits that a sentence of life imprisonment is necessary to reflect the seriousness of the defendant's offense, to promote respect for the law, and to provide just punishment. See 18 U.S.C. § 3553(a)(2)(A). As discussed above, the defendant orchestrated a politically motivated assassination that was only thwarted because of law enforcement intervention. To adequately punish the defendant for his plot, a serious punishment is necessary.

The government's recommended sentence also is necessary for specific and general deterrence. See 18 U.S.C. § 3553(a)(2)(B). With respect to specific deterrence, the defendant remains a threat to the United States. As discussed above, the evidence undermines any argument that the defendant was "coerced" into committing these crimes, as he argues. See Def. Ltr. 11. The Probation Department correctly noted that the defendant remains unrepentant and has an "untethered allegiance" to the IRGC. Recommendation at 2. Indeed, during his own testimony, the defendant refused to acknowledge that the IRGC was a terrorist organization and only conceded that he knew the United States believed it was. Tr. 1166. There is no reason to believe the defendant's deep commitment to terrorism, allegiance to the IRGC, and animosity toward the United States will subside with age either. See Saleh, 946 F.3d at 113 (recognizing the difficulty in deterring and rehabilitating those convicted of terrorism offenses). Therefore, life in prison is the only sentence that will ensure he never contributes to the threat of terrorism against the United States again.

Importantly, the Probation Department's recommended sentence of 30 years is insufficient to ensure the defendant spends the rest of his life in prison. Based on BOP guidelines and current law, the defendant likely would serve less than the full sentence imposed by the Court. Any sentence that leaves open the possibility of the defendant being released from jail is insufficient to protect the country.

The recommended sentence also promotes general deterrence, in that a life sentence will deter others who think they can plot a terrorist attack and flee the country without consequences. The Court's sentence should signal to others who choose to align themselves with a foreign terrorist organization with the stated goal of killing American citizens that their conduct will be met with the full might of the American justice system and punished harshly. A sentence of life imprisonment is necessary to show those who actively try to harm Americans that the U.S. legal system will hold them accountable.

Lastly, the cases the defendant relies on to argue that a lesser sentence is appropriate are inapposite. See Def. Ltr 11-12. In United States. Amirov, No. 22-CR-438 (S.D.N.Y. 2022), Amirov was a member of a Russian organized crime family. An IRGC operative—similarly situated to Asif Merchant—hired Amirov to assassinate an Iranian dissident living in the United States. The court sentenced Amirov to 25 years in prison. See id., ECF 160. Notably, Amirov was not ideologically motivated. Rather, he was motivated by the $500,000 bounty promised to him. See id., ECF 80, 157. Amirov also was not charged with a terrorism offense; he was charged

with murder for hire, murder for hire conspiracy, and possession of a defaced firearm. While his conduct was reprehensible and certainly deserving of the sentence he received, Amirov was a hired gun similarly situated to the purported hitmen in this case. Unlike Amirov, defendant Merchant was the brains behind the operation who was ideologically motivated to kill a politician. And, while a plot to assassinate an Iranian dissident purely because of her political views is inexcusable, the ramifications of a terrorist organization assassinating the former President of the United States or any American political figure is unprecedented and the attempt to do so warrants the most severe sentence.

Similarly, in United States v. Arbabsiar, No. 11-CR-897 (S.D.N.Y. 2011), Arbabsiar pled guilty to an information charging him with murder for hire and a Title 18, United States Code, Section 371 conspiracy in connection with his plot to hire hitmen to assassinate a Saudi Arabian Ambassador. See ECF 50. Arbabsiar's guilty plea capped his exposure to a 25-year sentence, which is the sentence the court imposed. See ECF 56. Defendant Merchant, unlike Arbabsiar, did not accept responsibility for his crimes and was convicted of a terrorism offense. Nor was Arbabsiar's plot "far more advanced" than the defendant's plot in this case, as he argues. See Def. Ltr. 12. Here, the defendant spent months being trained by his IRGC handler in a safehouse, repeatedly traveled to Iran, created a cover business, traveled to the United States, recruited Ali, hired hitmen, obtained money from overseas, paid the hitmen, googled and located campaign rallies, sent a covert message back to his IRGC handler, and involved his daughter in communicating with his IRGC handler. Then, as the defendant admitted, he moved his flight up because his work in the United States was finished and he could do the rest safely from overseas. Tr. 1165. Not only did the defendant get far along in his plot before it was foiled by law enforcement authorities, but as the Second Circuit made clear in Saleh, sentencings in terrorism cases are to be "enhanced without regard to whether due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences." 946 F.3d at 113 (citation omitted).

* * *

In short, the defendant put into motion an assassination attempt of a United States government official on behalf of a terrorist organization. There are no mitigating factors warranting a sentence below the Guidelines range of life imprisonment. The sentence handed down by this Court should ensure that the defendant does not have the opportunity to put Americans in danger ever again.

## V. Restitution, Fine and Forfeiture

The defendant is subject to criminal forfeiture and mandatory restitution. Although both forfeiture and restitution require a defendant to pay a stated amount of money, they serve different purposes. See United States v. Torres, 703 F.3d 194, 203 (2d Cir. 2012) (citing United States v. Pescatore, 637 F.3d 128, 138 (2d Cir. 2011)). "Restitution is loss based, while forfeiture is gain based." Id. (quoting United States v. Genova, 333 F.3d 750, 761 (7th Cir. 2003)).

According to 18 U.S.C. § 3663A, restitution in this case is mandatory. As of the date of this letter, no victims have requested restitution. The government respectfully requests

leave to file a supplemental restitution request should additional victims submit loss affidavits within 60 days of the sentencing hearing.

Regarding forfeiture, the defendant consented to the forfeiture of any property interest in an HP laptop computer, a Xiaomi Redmi cellphone, a Samsung Galaxy cellphone, and an Apple iPhone, all of which were seized in conjunction with the defendant's arrest, as well as the $5,000 he paid the purported hitmen. The defendant opposes the forfeiture of the approximately $1,048 that was seized from him at the time of his arrest on the grounds that the defendant needs the money. The $1,048 is forfeitable, however, because it is the proceeds of the money that the defendant's IRGC handler gave him to fund his assassination plot or substitute assets. See Tr. 1222 ("Q: And by the way, Merhardad Yousef, your SEPAH handler gave you $10,000 before you came to the United States, right? A: That is correct, yes.").

Each of these items and currency are forfeitable to the United States pursuant 18 U.S.C. §§ 981(a)(1)(C) and 981(a)(1)(G), and 28 U.S.C. § 2461(c), as a result of the defendant's conviction, as: (a) any property, real or personal, which constitutes or is derived from proceeds traceable to the defendant's violations of 18 U.S.C. §§ 1958(a), 2332b(a)(1), and 2332b(a)(2); (b) all assets, foreign or domestic (i) of any individual, entity, or organization engaged in planning or perpetrating any Federal crime of terrorism (as defined in 18 U.S.C. § 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, and all assets, foreign or domestic, affording any person a source of influence over any such entity or organization, (ii) acquired or maintained by any person with the intent and for the purpose of supporting, planning, conducting, or concealing any Federal crime of terrorism (as defined in 18 U.S.C. § 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, (iii) derived from, involved in, or used or intended to be used to commit any Federal crime of terrorism (as defined in 18 U.S.C. § 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, or (iv) of any individual, entity, or organization engaged in planning or perpetrating any act of international terrorism (as defined in 18 U.S.C. § 2331) against any international organization (as defined in 22 U.S.C. § 4309(b)) or against any foreign Government; and/or (c) substitute assets, pursuant to 21 U.S.C. § 853(p).

The government understands the maximum fine to be imposed is $250,000 on both Counts One and Two. See 18 U.S.C. § 3571(b)(3); PSR ¶ 83.

VI. Conclusion

For the reasons stated above, the government respectfully requests that the Court sentence the defendant to life imprisonment on Count One and a mandatory consecutive sentence of 10 years' imprisonment on Count Two.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York

By: /s/
Sara K. Winik
Nina C. Gupta
Gilbert M. Rein
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of Court (EK) (by ECF)
Defense counsel (by ECF)
Jennifer Baumann, Senior United States Probation Officer (by Email)